## Commonwealth v. Brewer et al.

*William M. Randolph,* for Commonwealth.

*Percy C. Pachtman* and *Jacob Seligsohn,* for defendants.

*John Heron,* for University of Pittsburgh.

MUSMANNO, J., September 16, 1932.—Defendants have appealed from summary convictions before a magistrate on charges of disorderly conduct and they have come before this court for a hearing de novo. The court has listened very attentively to the evidence, and there is no reason why a decision cannot be rendered at once. This prosecution was founded on the Act of May 2, 1901, P. L. 132, which has to do with the offense known as disorderly conduct.

On June 8, 1932, Rev. Willard Mellin, pastor of the Oakmont Presbyterian Church, and Rev. Basil A. Murray, pastor of the Hiland Presbyterian Church, were standing close to the "Y" hut, on the campus of the University of Pittsburgh. Rev. Mellin had been invited by Leonard Grumet, a student of the university, acting on behalf of other students interested in a peaceable anti-war demonstration, to make an address against war. At 10 minutes after 9, Leonard Grumet informed Rev. Willard Mellin that the permit for the meeting had been denied by the university authorities and that accordingly no meeting would take place.

Louis Teitelbaum, Leonard Grumet and A. D. Brewer were inside the hut when W. D. Harrison, director of athletics, arrived. Mr. Harrison entered the hut with Lieut. Edwin Goodwin, of the Pittsburgh police. They found the three

defendants in an inner room. Five signs carrying various protests against war were on a table close by, and apparently these signs were to have been attached to some sticks which were also there, so that they might be borne in a pacifist parade. Mr. Harrison was apparently incensed at the action of these students in attempting to hold a meeting, and an argument ensued between him and the defendants. This argument was the usual heated discussion which follows when excitable persons taking opposite views clash in verbal warfare, but there was nothing violent or unusually noisy about the informal debate. Mr. Harrison then instructed Lieut. Goodwin to arrest the three defendants. They were arrested, subsequently taken before a magistrate, and adjudged guilty of the offense of disorderly conduct.

It is utterly amazing to this court that these three youths should have been subjected to a criminal prosecution on so trivial and so insignificant an infraction of the rules of the university and proprieties of campus conduct, if any there were. Certainly, there was no criminal conduct on their part. This court exceedingly regrets that the university authorities permit sensationalism to arise out of incidents which would otherwise pass unnoticed. The University of Pittsburgh is a wonderful, laudable institution, which should awaken the pride of every person in western Pennsylvania interested in higher education, and the court repeats that it is regrettable and blameworthy on the part of the authorities that they permit themselves to lose a sense of proportion and indiscriminately cause arrests, which can only result in bringing the good name of that splendid university into disrepute.

Nothing occurred that morning which could under the most widesweeping interpretation be considered disorderly conduct under the Act of May 2, 1901, P. L. 132. Lieut. Goodwin, of the Pittsburgh police, testified, in referring to the defendants, "They were very orderly, outside of loud talking". There was no evidence that this loud talking in any way disturbed or annoyed the peaceable residents nearby or in any way caused an annoyance to those on the public highway. The people who gathered about the hut did so because they were attracted there by the sight of numerous police, and not because the defendants had in any way manifested criminality or any desire to create a disturbance. Prof. Carl Saalbach, testifying for the Commonwealth, stated there was no disturbance. In fact, the entire decision in this case can be predicated exclusively on the State's case, without considering at all the testimony adduced on behalf of the defendants.

The authorities of the University of Pittsburgh saw fit to deny the students their meeting, and it was certainly within their province to do so. The meeting was to take place an hour and a half before the commencement exercises, at which Gen. McArthur, of the United States Army, was to speak, and perhaps it might have seemed to the authorities that an anti-war meeting, scheduled just before Gen. McArthur's speech, could be construed as an anticipatory rebuttal to whatever argument he might have advanced. At any rate, the authorities had the right to assume that this would be embarrassing to the guest of honor and perhaps even provocative of disorder. And it is reasonable that there should be no untoward incident on that culminating day of the university year's activities, commencement day, with all the ideals which are consecrated on that memorable day of the history of any college.

But the authorities denied the permit for the meeting and ordered the arrest of the boys in a manner that could and would ordinarily be interpreted as a curbing of free speech. There was nothing unpatriotic or disrespectful about the choice of speaker for the day. The speaker was Rev. Willard Mellin. This is the first time the court has seen him, but he seems a very respectable and patriotic person and he is pastor of a very respectable church, and the court

just heard within the last 15 or 20 minutes that he is also a war veteran. His address was to have been the same one that he delivered on Memorial Day in a cemetery. This is sufficient indication of its nonprovocative character. The authorities, by permitting the meeting to take place, or by calmly dispersing the students—and there is no evidence that they in any way resisted the authorities—would have avoided this most unfortunate arrest, and they would have avoided the drawing of public attention to what seems, which might not be true, a very illiberal attitude on their part.

While the court admits that the constitutional right of free speech may be abused, there is no evidence that there was any such abuse here. College students are not intended to be empty tanks into which wisdom is to be poured. A college student's head is not a sponge which is to absorb everything that a college professor happens to say. Education consists in not only acquiring knowledge and data but in thinking as well. The main purpose of a university education should be to make students think, and how can there be thinking without free speech? If expression is repressed, the thinking processes are gelatinized, and in time the brain becomes a mere jelly-like substance, floating about in its bony cavern. And, if there ever was a time to think, this is the time. Any wholesome thought that can be advanced on the problems which confront mankind today should be listened to, or at any rate should not be repressed to the point where the denial of expression may result in dangers far more alarming than the views the expression would have aired.

The Commonwealth has absolutely failed to make out a charge of disorderly conduct under the act involved. The defendants are adjudged not guilty and are accordingly discharged.

From William J. Aiken, Pittsburgh, Pa.